IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| TERRY HAIRSTON, II, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:15CV1100 |
| | ) | |
| SHERIFF BJ BARNES, in his official and personal capacities, | ) ) ) | |
| | ) | |
| Defendant. | ) | **FILED UNDER SEAL** |

## <u>MEMORANDUM OPINION AND ORDER</u>

**OSTEEN, JR., District Judge**

Currently before this court is Defendant BJ Barnes' motion for summary judgment. (Doc. 50.) Defendant asks this court to enter summary judgment on his behalf on Plaintiff Terry Hairston's claims for race-based employment discrimination, retaliation, and failure to accommodate a medical disability. Defendant has also moved to seal, (Doc. 51), the exhibits to his motion to summary judgment, and Plaintiff has moved to seal, (Doc. 56), certain exhibits to his response opposing summary judgment. For the reasons that follow, this court finds that Defendant's motion for summary judgment should be granted, Defendant's motion to seal should be granted, and Plaintiff's motion to seal should be granted in part and denied in part.

## I. __FACTUAL BACKGROUND__

Plaintiff was employed by the Guilford County Sheriff's Office from April 1994 until November 2016. (Fourth Amended Complaint ("Fourth Am. Compl.") (Doc. 42) ¶¶ 39, 70.) The Sheriff's Office is divided into detention and patrol branches; the detention branch deals primarily with prison inmates and is generally considered inferior in pay and benefits to the patrol branch. (Id. ¶ 9.) Plaintiff describes a long history of allegedly discriminatory treatment by the Sheriff's Office against black employees, including a systematic practice of failing to promote black officers in the patrol branch. (See id. ¶¶ 10-11.) Defendant admits that certain of the underlying events occurred but does not agree that any of the acts constitute discrimination. (See generally (Doc. 43).) Plaintiff further alleges, by reference to specific examples, that white officers generally receive more favorable job opportunities and more lenient discipline than similarly-situated black officers. (See Fourth Am. Compl. (Doc. 42) ¶¶ 12–38.)

Plaintiff consistently received stellar performance reviews and, in 2002, was promoted to sergeant within the detention branch. (Id. ¶¶ 40-41.) In October 2012, Plaintiff applied for a Transportation Sergeant position with an 8 a.m. to 5 p.m. schedule instead of twelve-hour rotating shifts. (Id. ¶ 42.)

-2-

This was a lateral move to another sergeant position with different job responsibilities. (Excerpts from Pl.'s 11/16/2017 Deposition ("Pl.'s Dep. B") (Doc. 58-2) at 14.)[1] Plaintiff was not selected for the position, which was instead given to a white Master Corporal who had worked in the Transportation Department; the white corporal was selected for the job in January 2013. (Fourth Am. Compl. (Doc. 42) ¶ 46; Pl.'s Dep. B (Doc. 58-2) at 16.) Shortly after not receiving the Transportation Sergeant position, in the spring of 2013, Plaintiff was promoted to Shift Lieutenant within the detention branch. (Pl.'s Dep. B (Doc. 58-2) at 16-17.) Plaintiff filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC") in April 2015. (Fourth Am. Compl. (Doc. 42) ¶ 47.)

Following his first EEOC filing, Plaintiff alleges that Defendant retaliated against him in several ways. First, time was removed from Plaintiff's work entries, lowering his pay, and the secretary responsible for monitoring time cards told Plaintiff she was instructed by Human Resources ("HR") to remove this time. (Id. ¶ 48.) Second, Plaintiff alleges that his files

---

[1] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

and emails were monitored. (Id. ¶ 49.) Third, Plaintiff received a formal disciplinary letter and was placed on probation in June 2015 for improperly checking prisoner's cells, which Plaintiff contends was a disproportionate response to this violation. (Id. ¶ 50; Pl.'s Dep. B (Doc. 58-2) at 23.) Fourth, Plaintiff was allegedly disparaged by Defendant over email and during an in-person meeting in October 2015. (Fourth Am. Compl. (Doc. 42) ¶¶ 51–52.) After Plaintiff raised concerns that detention officers were treated less favorably, Plaintiff alleges that Defendant made statements to him during a department-wide meeting that alluded to this litigation and referenced a willingness to "bow up in the sand and . . . fight . . . [by] instruct[ing Defendant's] attorneys to go to trial." (Pl.'s Dep. B (Doc. 58-2) at 51–52.) Due to these events, Plaintiff filed an EEOC retaliation charge in February 2016. (Fourth Am. Compl. (Doc. 42) ¶ 53.)

    In April 2016, Plaintiff alleges that he was forbidden from wearing his department-issued toboggan (a wool hat) inside the office, contrary to Sheriff's Office policy. (Id. ¶¶ 54–56.) Plaintiff produced a doctor's note and was subsequently permitted to wear the hat. (Id. ¶ 57.) In May 2016, Plaintiff informally complained within the department that terminated black officers were treated more harshly than terminated white

-4-

officers. (Id. ¶ 58.) The day after making this observation, Plaintiff's parking fob and key card did not function properly and Plaintiff was forced to enter the Sheriff's Office through the visitor entrance. (Id. ¶¶ 59–61; Pl.'s Dep. B (Doc. 58-2) at 38.) In June 2016, Plaintiff's paycheck omitted holiday pay amounts for Memorial Day and Plaintiff had to alert Human Resources ("HR") to fix the issue. (Fourth Am. Compl. (Doc. 42) ¶ 62.)

Plaintiff was diagnosed with anxiety disorder in July 2016 and took paid medical leave between July 29, 2016 and October 24, 2016. (Id. ¶¶ 63–65.) As the expiration date of Plaintiff's paid leave neared, Plaintiff asked co-workers to donate their leave time to him. (Id. ¶ 66.) Plaintiff later learned that some of the potential donors had been approached and investigated by Internal Affairs for violating department policy. (Id.; Pl.'s Dep. B (Doc. 58-2) at 44–45.) Plaintiff was permitted to receive and use the maximum number of donated hours. (Pl.'s Dep. B (Doc. 58-2) at 42.) Plaintiff then requested additional unpaid leave, which was granted through November 4, 2016. (Excerpts from Pl.'s 11/16/2017 Deposition ("Pl.'s Dep. A") (Doc. 53-1) at 25.) Plaintiff requested further leave through December 20, 2016, but the Sheriff's Office denied

this request and terminated Plaintiff on November 4, 2016. (Fourth Am. Compl. (Doc. 42) ¶¶ 67, 70; Doc. 53-3 at 6.)

## II.  <u>PROCEDURAL HISTORY</u>

Plaintiff received an EEOC right-to-sue letter on September 30, 2015, (Doc. 10-2), and timely filed his initial complaint in this court on December 29, 2015. (Doc. 1.) Plaintiff subsequently amended his complaint four times. The current version is the Fourth Amended Complaint, (Fourth Am. Compl. (Doc. 42)), which lists only Barnes as Defendant.[2]

Defendant filed an answer to the complaint, (Doc. 43), and subsequently moved for summary judgment, (Doc. 50). Defendant filed a memorandum in support of his motion for summary judgment. (<u>See</u> Def.'s Mem. of Law in Supp. of Mot. for Summ. J.

---

[2] While Title VII does not permit a plaintiff to sue their supervisor in his or her individual capacity, <u>Lissau v. S. Food Serv., Inc.</u>, 159 F.3d 177, 180 (4th Cir. 1998), "in North Carolina, each county's sheriff is an 'employer' within the meaning of Title VII and must be named as a defendant in a Title VII suit." <u>Efird v. Riley</u>, 342 F. Supp. 2d 413, 420 (M.D.N.C. 2004). The complaint states that Defendant is sued "in his official and personal capacities." (Fourth Am. Compl. (Doc. 42).) However, Plaintiff identifies no law that would permit Plaintiff to sue Defendant in his personal capacity. Title VII, the Americans with Disabilities Act ("ADA"), and the North Carolina constitution all permit suit only against employers, and a sheriff can be sued only in his official capacity as an employer. <u>See</u> <u>Baird ex rel. Baird v. Rose</u>, 192 F.3d 462, 471 (4th Cir. 1999) (ADA); <u>Lissau</u>, 159 F.3d at 181 (Title VII); <u>Corum v. Univ. of N.C. Through Bd. of Governors</u>, 330 N.C. 761, 788–89, 413 S.E.2d 276, 293 (1992) (North Carolina state constitution).

-6-

("Def.'s Mem.") (Doc. 54).) Defendant simultaneously moved to seal certain exhibits attached to his motion for summary judgment, (Doc. 51), and submitted a brief in support of that motion, (Doc. 52). Plaintiff responded opposing the motion for summary judgment. (See Pl.'s Resp. Br. in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Resp. Br.") (Doc. 55).) Plaintiff also moved to seal exhibits attached to his response, (Doc. 56), and submitted a brief in support of that motion, (Doc. 57). Defendant then replied in support of his motion for summary judgment. (See Doc. 60.)

## III. **STATUTE OF LIMITATIONS**

Plaintiff brings his employment discrimination claim in part under Title VII of the Civil Rights Act of 1964. The enforcement provisions of Title VII state that "[a] charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1); see also Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109–10 (2002) (stating that "a litigant has up to 180 or 300 days after the unlawful practice happened to file a charge with the EEOC," depending on whether the litigant also files their complaint with a state agency). "Each discrete discriminatory act starts a new clock for filing charges alleging that act." Morgan, 536 U.S. at 113. "[A] timely

charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 392 (1982) (footnote omitted).

Title VII further requires that a plaintiff "exhaust her administrative remedies by filing a charge of discrimination with the EEOC" before bringing suit. Hentosh v. Old Dominion Univ., 767 F.3d 413, 416 (4th Cir. 2014). The failure to do so means that a federal court lacks subject matter jurisdiction over the claim. Id. When "the claims raised under Title VII exceed the scope of the EEOC charge and any charges that would naturally have arisen from an investigation thereof, they are procedurally barred" because the plaintiff has failed to exhaust remedies as to those claims. Dennis v. Cty. of Fairfax, 55 F.3d 151, 156 (4th Cir. 1995). The one exception to this general rule is that new retaliation claims may be brought in federal court in the first instance even if not specifically asserted in an EEOC charge, when based on a good faith belief that the alleged retaliatory conduct relates to the original charge. See Nealon v. Stone, 958 F.2d 584, 590 (4th Cir. 1992).

While Defendant does not contest the timeliness of Plaintiff's claims or whether Plaintiff has exhausted his

-8-

administrative remedies, this court will briefly examine these threshold requirements. Plaintiff's discrimination claim is based, in part, on the alleged adverse employment action of Defendant's failure to promote Plaintiff to the Transportation Sergeant position. This act occurred in January 2013, when a white Master Corporal was selected for the position instead. (Fourth Am. Compl. (Doc. 42) ¶ 46.) Plaintiff filed his first EEOC charge on April 2, 2015, (id. ¶ 47), at least 791 days after the allegedly wrongful failure to promote. The complaint does not contain any allegations regarding the intervening period between January 2013 and April 2015, or any allegations that suggest the 180-day filing window should be equitably tolled in Plaintiff's case. Therefore, to the extent that Plaintiff's discrimination claim is based on the alleged failure to promote, Plaintiff has failed to abide by the EEOC filing requirements and the claim is not timely.

Because the 180-day limit is not a jurisdictional requirement, courts generally do not dismiss those claims or pieces of claims that fall outside of the relevant time window sua sponte without action by the defendant raising statute of limitations as an affirmative defense. See Zipes, 455 U.S. at 398 (describing the holding in Mohasco Corp. v. Silver, 447 U.S. 807 (1980); observing that the Supreme Court did not dismiss

plaintiff's untimely claims <u>sua</u> <u>sponte</u>, but rather assumed jurisdiction over all claims because the employer did not raise the issue). Statute of limitations is an affirmative defense that must be raised by the defendant, either in the answer or in a motion to dismiss. Fed. R. Civ. P. 8(c)(1) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including . . . statute of limitations."); <u>see also</u> <u>Eriline Co. S.A. v. Johnson</u>, 440 F.3d 648, 653–54 (4th Cir. 2006) ("Where a defendant has failed to raise a statute of limitations defense by way of its answer, the defense is usually waived."). Here, Defendant does not raise statute of limitations in his answer, (<u>see</u> Doc. 43), and this court will therefore consider the defense waived despite Plaintiff's apparent failure to comply with the statutory filing requirements for his failure-to-promote discrimination claim.

Plaintiff also did not file an EEOC charge after he was terminated. To the extent that Plaintiff's discrimination claim is based on Plaintiff's 2016 termination, this court finds that Plaintiff has failed to exhaust administrative remedies because Plaintiff's EEOC charges, both of which were filed prior to his termination, do not describe to the termination and Plaintiff failed to file an additional EEOC charge within 180 days of being fired. <u>See</u> <u>Hentosh</u>, 767 F.3d at 415–16 (affirming a

district court's dismissal of a discrimination claim based on denial of tenure, where the plaintiff filed an EEOC charge prior to being denied tenure). This fact deprives this court of subject matter jurisdiction over Plaintiff's termination-based discrimination claim.[3]

Plaintiff filed his second EEOC charge in February 2016 and alleges multiple retaliatory acts in the immediately preceding 180-day period. (<u>See</u> Fourth Am. Compl. (Doc. 42) ¶¶ 48-52.) Therefore, this charge was timely filed as to those events. As to additional allegedly retaliatory events (including Plaintiff's ultimate termination), Plaintiff may properly pursue a retaliation claim based on these events despite not filing an event-specific EEOC charge because the events are reasonably related to Plaintiff's February 2016 charge. <u>See</u> <u>Nealon</u>, 958 F.2d at 590.

## IV. <u>STANDARD OF REVIEW</u>

In reviewing a motion for summary judgment, this court must determine whether there remains a "genuine dispute as to any

---

[3] This discussion, however, applies only to discriminatory termination and not a retaliatory termination. Where "the alleged retaliatory termination was merely the predictable culmination of [the employer]'s alleged retaliatory conduct" and thus "reasonably related" to conduct alleged in an initial EEOC charge, the termination itself relates back to the initial charge and the plaintiff is deemed to have exhausted administrative remedies. <u>Jones v. Calvert Grp., Ltd.</u>, 551 F.3d 297, 303-04 (4th Cir. 2009).

-11-

material fact." Fed. R. Civ. P. 56(a). "Once a defendant makes a properly supported motion for summary judgment, the burden shifts to the plaintiff to set forth specific facts showing that there is a genuine issue for trial." Sylvia Dev. Corp. v. Calvert Cty., 48 F.3d 810, 817 (4th Cir. 1995). "On summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 654 (1962) (per curiam). If there is no genuine dispute about any fact material to the moving party's claim, then "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A factual dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289–90 (1968) (stating that a dispute is not genuine for summary judgment purposes when one party rests solely on allegations in the pleadings and does not produce any evidence to refute alternative arguments). This court must look to substantive law to determine which facts are material — only those facts "that might affect the outcome of the suit under the

governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.

In addition, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." Id. at 247-48. "[T]he non-moving party must do more than present a scintilla of evidence in its favor." Sylvia Dev., 48 F.3d at 818. Ultimately, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249.

V.    **MOTION FOR SUMMARY JUDGMENT**

    A.    **Employment Discrimination**

        1.    **Legal Framework**

Title VII and 42 U.S.C. §§ 1981 and 1983 each prohibit employment discrimination on the basis of race. See, e.g., 42 U.S.C. § 2000e-2(a)(1). A race-based employment discrimination claim asserts that the plaintiff "belongs to a racial minority" and was either not hired, fired or suffered some adverse employment action due to his race. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

Employment discrimination claims ordinarily deal with "ultimate" employment decisions — the employer's decision to hire, fire, promote or demote an employee. Page v. Bolger, 645

-13-

F.2d 227, 233 (4th Cir. 1981). Title VII liability also extends to any "adverse employment action" that had "some significant detrimental effect on [the employee]." <u>Boone v. Goldin</u>, 178 F.3d 253, 256 (4th Cir. 1999). An adverse employment action Title VII claim includes the following elements: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class."[4] <u>Coleman v. Md. Ct. of Appeals</u>, 626 F.3d 187, 190 (4th Cir. 2010); <u>see also</u> <u>Love-Lane v. Martin</u>, 355 F.3d 766, 787 (4th Cir. 2004).

A race discrimination plaintiff is required to plead facts that permit the court to reasonably infer each element of the prima facie case, including less favorable treatment than similarly-situated employees outside of the protected class. <u>McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.</u>, 780 F.3d 582, 585 (4th Cir. 2015). A plaintiff may prove a Title VII claim either by direct or indirect evidence, or under the

---

[4] The Fourth Circuit has "held that the factual elements necessary to establish a <u>prima facie</u> case of employment discrimination are the same for Title VII, Section 1981, and Section 1983 claims." <u>Hooper v. State of Md., Dept. of Human Res.</u>, No. 94-1067, 1995 WL 8043, at *3 (4th Cir. 1995). While a § 1983 claim is not subject to the EEOC filing requirements described previously and thus cannot be dismissed in part for failure to exhaust administrative remedies, <u>see</u> <u>Causey v. Balog</u>, 162 F.3d 795, 804 (4th Cir. 1998), this court simply notes that it still finds Plaintiff's § 1983 claim should be dismissed at summary judgment as described hereinafter.

-14-

*McDonnell Douglas* burden-shifting framework. *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015). Under the burden-shifting framework, after the plaintiff has made a plausible showing of each element, the claim will survive a motion to dismiss and the burden then shifts to the defendant to provide "some legitimate, nondiscriminatory reason" for the disparate treatment. *McDonnell Douglas*, 411 U.S. at 802. "This burden is one of production, not persuasion; it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (internal quotation marks and citation omitted). Finally, once the defendant has put forth a non-discriminatory rationale, the plaintiff must "show that petitioner's stated reason for [the adverse action] was in fact pretext." *McDonnell Douglas*, 411 U.S. at 804.

At the summary judgment stage, "a reason cannot be proved to be a pretext _for discrimination_ unless it is shown _both_ that the reason was false, _and_ that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (internal quotation marks omitted). In other words, it is not enough for the plaintiff to merely refute the proffered non-discriminatory explanation; rather, the plaintiff also bears the burden of producing evidence "on which a juror could reasonably base a finding that discrimination motivated the challenged

-15-

employment action." <u>Vaughan v. Metrahealth Cos.</u>, 145 F.3d 197, 202 (4th Cir. 1998), <u>abrogated on other grounds by Reeves</u>, 530 U.S. 133 (2000); <u>see also Okoli v. City of Balt.</u>, 648 F.3d 216, 223 (4th Cir. 2011) ("The City also maintains it had a legitimate nondiscriminatory reason for terminating Okoli that has not been shown to be pretextual. Okoli must then show that the proffered reason is false."); <u>Smith v. First Union Nat'l Bank</u>, 202 F.3d 234, 249 (4th Cir. 2000) ("Smith has failed to produce sufficient evidence that discrimination motivated First Union's failure to transfer her to a new position.").

While the employer meets its burden of production solely by putting forth <u>any</u> legitimate non-discriminatory rationale for the adverse action, the plaintiff may still avoid summary judgment if "the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." <u>Reeves</u>, 530 U.S. at 147; <u>see also Guessous v. Fairview Prop. Invs., LLC</u>, 828 F.3d 208, 217 (4th Cir. 2016). And, "once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." <u>Reeves</u>, 530 U.S. at 147.

-16-

## 2.   **Failure to Promote**

Plaintiff's race discrimination claim, brought pursuant to 42 U.S.C. § 1981 and 42 U.S.C. § 2000e-2(a)(1), is based on two discrete actions: (1) Defendant's failure to promote Plaintiff to the Transportation Sergeant position to which he applied, and (2) Defendant's termination of Plaintiff. (Fourth Am. Compl. (Doc. 42) ¶ 75.) Plaintiff is African-American and thus a member of a protected class. Love-Lane, 355 F.3d at 787.

As to Plaintiff's failure-to-promote claim, this court does not believe that Plaintiff's application to the Transportation Sergeant position was in fact a potential promotion. Plaintiff admits that the Transportation Sergeant opening was not a "promotion in position" because Plaintiff was already a sergeant at the time, and Plaintiff agrees that the intended move was "lateral"; Plaintiff also was unsure whether the new position would have come with an increase in salary. (See Pl.'s Dep. A (Doc 53-1) at 10–11.) However, Plaintiff asserts that the Transportation Sergeant position entailed a better working schedule than his existing position because he would have worked only "Monday through Friday eight to five, [rather than] . . . a 12-hour rotating shift." (Id.)

Title VII liability extends only to adverse employment actions, which normally involve "such obvious end-decisions as

-17-

those to hire, to promote, etc.," Page, 645 F.2d at 233, and
actions that have a significant detrimental effect on the
employee. In this vein, several courts have held that
"[r]efusing an employee's request for a purely lateral transfer
does not qualify as an ultimate employment decision." See Burger
v. Cent. Apartment Mgmt., Inc., 168 F.3d 875, 879–80 (5th Cir.
1999) (collecting cases and noting that the court's view
"comports with the clear trend of authority in other circuits
holding that a purely lateral transfer is not an adverse
employment action"); see also O'Neal v. City of Chi., 392 F.3d
909, 912–13 (7th Cir. 2004) (holding that a similar internal
police department transfer to a unit with different
responsibilities and a different schedule did not constitute
adverse action; noting that "any lateral job transfer will
result in changes to an employee's job responsibilities and work
conditions . . . [and] a plaintiff must show something more than
the ordinary difficulties associated with a job transfer").

While Boone v. Goldin and its progeny recognize that an
adverse employment action extends beyond a defined set of
employer decisions, see Boone, 178 F.3d at 256, this court finds
that denial of a purely lateral transfer request will rarely, if
ever, have a significant detrimental effect when the potential
transfer does not involve a salary increase or a demonstrable

-18-

improvement in career prospects. Here, Plaintiff alleges only
that the consistent 8 a.m. to 5 p.m. schedule would have been
beneficial, (Pl.'s Dep. A (Doc. 53-1) at 11), and that the
working conditions in the Transportation Department were less
traumatic and less stressful, (see Pl.'s Dep. B (Doc. 58-2) at
55-56.) But the Fourth Circuit has explicitly rejected "vague
allegations of stress" in the context of employer-driven
reassignment and noted that, "absent any [change] in
compensation, job title, level of responsibility, or opportunity
for promotion, reassignment to a new position commensurate with
one's salary level does not constitute an adverse employment
action even if the new job does cause some modest stress."
Boone, 178 F.3d at 256-57; see also James v. Booz-Allen &
Hamilton, Inc., 368 F.3d 371, 376 (4th Cir. 2004) ("The mere
fact that a new job assignment is less appealing to the
employee, however, does not constitute adverse employment
action.").

This situation is the inverse of Boone and James, because
Plaintiff challenges the denial of his application to a new,
presumably less stressful position as opposed to challenging an
employer's decision to reassign him to an inferior position. But
this court finds that the same legal standard applies. Plaintiff
has not alleged that he was denied any increase in

"compensation, job title, level of responsibility, or opportunity for promotion" and fails to show that the transfer denial had a "significant detrimental effect" on him beyond denying him a preferable schedule and work environment. Therefore, Plaintiff fails to create a genuine factual dispute as to whether Defendant's denial of his application to the Transportation Sergeant position was an adverse employment action. Defendant's motion for summary judgment on Plaintiff's failure-to-promote discrimination claim will be granted.[5]

### 3. Termination

As previously stated, this court has determined that it lacks subject matter jurisdiction over Plaintiff's discriminatory termination claim because Plaintiff failed to exhaust his administrative remedies. This court will therefore dismiss this claim pursuant to Fed. R. Civ. P. 12(b)(1). Even assuming arguendo that this court does have jurisdiction, this court further concludes that Plaintiff has failed to create a genuine factual dispute regarding essential elements of this

---

[5] Because this court finds no adverse employment action, it does not reach the question of whether Defendant's proffered non-discriminatory rationale for rejecting Plaintiff's application to the Transportation Sergeant position — the desire to hire an applicant with experience in the Transportation Division, experience working in a supervisory role, and an Armed Detention Officer certification, (see Def.'s Mem. (Doc. 54) at 15-16) — is sufficient to award summary judgment on the discriminatory treatment prong.

claim and that Defendant is therefore entitled to summary judgment.

Here, there is no dispute that Plaintiff's termination was an adverse employment action. See Strothers v. City of Laurel, 895 F.3d 317, 328 (4th Cir. 2018) ("[I]t is patently obvious and undisputed that termination is a materially adverse action."). The question, then, is whether Plaintiff has put forth sufficient evidence to create a material issue of fact regarding whether Defendant's proffered non-discriminatory rationale is a pretext for discrimination.

Plaintiff is required to show both that (1) "[he] was performing [his] job duties at a level that met [his] employer's legitimate expectations at the time of the [termination]; and [2] the position remained open or was filled by similarly qualified applicants outside the protected class." Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004), abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338 (2013). Once the defendant puts forth a non-discriminatory rationale for its conduct, the plaintiff must demonstrate "both that the reason was false, and that discrimination was the real reason." St. Mary's Honor Ctr., 509 U.S. at 515.

Defendant proffers a non-discriminatory justification for Plaintiff's termination: that Plaintiff's "continued absence from work imposed an undue hardship" on the Sheriff's Office. (Def.'s Mem. (Doc. 54) at 21.) According to Plaintiff's deposition testimony, Plaintiff has been unable to work since July 29, 2016, and remains medically incapable of holding any job. (Pl.'s Dep. A (Doc. 53-1) at 14.) By Plaintiff's own admission, he was not performing at a level that met his employer's legitimate expectations at the time of termination. Far from rebutting Defendant's proffered non-discriminatory rationale or presenting evidence that this rationale was a pretext for discrimination, Plaintiff's testimony reinforces the fact that Defendant most likely fired Plaintiff due to his medical inability to work. This court further notes that Plaintiff has failed to allege that his position was either left unfilled or filled by a non-minority replacement, (see id. at 21 (Plaintiff states that he cannot recall who filled his position after he was terminated)), which is a required element of a discriminatory termination claim. Hill, 354 F.3d at 285. Plaintiff fails to raise any genuine factual dispute as to whether he was meeting his employer's legitimate expectations and whether his termination was actually motivated by racial

discrimination. Therefore, Defendant's motion for summary judgment on this claim will be granted.

**B.    Retaliation**

**1.    Legal Framework**

The Americans with Disabilities Act ("ADA") prohibits discrimination against any individual because of that person's opposition to substantive ADA violations. <u>See</u> 42 U.S.C. § 12203(a). Title VII also bans retaliation, or discrimination against any person "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). The legal standard for ADA and Title VII retaliation claims is identical.[6] <u>See, e.g.</u>, <u>Fox v. Gen. Motors Corp.</u>, 247 F.3d 169, 176 (4th Cir. 2001) ("[C]ourts have routinely used Title VII precedent in ADA cases."); <u>Stewart v. Happy Herman's Cheshire Bridge, Inc.</u>, 117 F.3d 1278, 1287 (11th Cir. 1997) ("[W]e assess ADA retaliation claims under the same framework we employ for retaliation claims arising under

---

[6] As stated previously, the same legal standard applies to retaliation claims under 42 U.S.C. §§ 1981 and 1983. <u>See, e.g.</u>, <u>Hartman v. Moore</u>, 547 U.S. 250, 259 (2006) (stating that, for a § 1983 claim, a "plaintiff must show a causal connection between a defendant's retaliatory animus and subsequent injury in any sort of retaliation action").

Title VII."). Therefore, this court will not differentiate between ADA and Title VII protected conduct in this section — if a reasonable juror could find that <u>any</u> protected conduct caused any adverse action, summary judgment will be denied.

"To establish a prima facie retaliation claim . . . a plaintiff must prove (1) he engaged in protected conduct, (2) he suffered an adverse action, and (3) a causal link exists between the protected conduct and the adverse action." <u>Reynolds v. Am. Nat'l Red Cross</u>, 701 F.3d 143, 154 (4th Cir. 2012); <u>see also</u> <u>Boyer-Liberto v. Fontainebleau Corp.</u>, 786 F.3d 264, 281 (4th Cir. 2015).

The plaintiff is not required to know to a certainty that the opposed practice is unlawful. Rather, a plaintiff's opposition to any employer action that he reasonably believed to be a substantive ADA or Title VII violation is protected conduct. <u>E.E.O.C. v. Navy Fed. Credit Union</u>, 424 F.3d 397, 406 (4th Cir. 2005); <u>see also</u> <u>Reynolds</u>, 701 F.3d at 154. The bar for what constitutes opposition is not high: any comment that disapproves of allegedly discriminatory workplace conduct is considered opposition to an unlawful employment practice. <u>See</u> <u>Crawford v. Metro. Gov't of Nashville and Davidson Cty.</u>, 555 U.S. 271, 276 (2009); <u>DeMasters v. Carilion Clinic</u>, 796 F.3d 409, 417 (4th Cir. 2015).

-24-

An "adverse action" is any action that is materially
adverse or would have "dissuaded a reasonable worker from making
or supporting a charge of discrimination," even if the action
was not directly tied to employment. Burlington N. & Santa Fe
Ry. Co. v. White, 548 U.S. 53, 62, 66–68 (2006) (quoting
Washington v. Ill. Dep't of Revenue, 420 F.3d 658, 662 (7th Cir.
2005)); see also Rhoads v. F.D.I.C., 257 F.3d 373, 392 (4th Cir.
2001). This standard is objective but also employee-specific; it
does not account for "a plaintiff's unusual subjective
feelings," but does account for circumstances such as childcare
responsibilities and other out-of-work commitments. See
Burlington N. & Santa Fe, 548 U.S. at 68–69 (distinguishing the
failure to invite an employee to lunch on a single occasion from
the repeated exclusion of an employee from a weekly training
seminar). A lower degree of adverse action is required to
support a retaliation claim than a substantive discrimination
claim, because "[t]he scope of the antiretaliation provision
extends beyond workplace-related or employment-related
retaliatory acts and harm." Id. at 67. However, "petty slights
or minor annoyances that often take place at work and that all
employees experience" are not materially adverse. Id. at 68.

To establish a causal link, the third element, a plaintiff
must show but-for causation. Foster, 787 F.3d at 249. Title VII

-25-

discrimination claims can proceed on a mixed-motive theory if the plaintiff shows that any impermissible consideration was "a motivating factor for any employment practice, even though other factors also motivated the practice," 42 U.S.C. § 2000e-2(m), but retaliation claims are held to a higher standard. The plaintiff must present "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Nassar, 570 U.S. at 360.

Whether a plaintiff proceeds on circumstantial (indirect) evidence of retaliatory intent or under the burden-shifting framework, they are required to show that a reasonable juror could find that the adverse action would not have occurred but for retaliatory animus by the defendant. See Foster, 787 F.3d at 251–52. For example, in Rhoads, the Fourth Circuit held that summary judgment was inappropriate where the plaintiff had rebutted the defendant employer's stated "explanation that Rhoads was fired for excessive unexcused absenteeism" by producing adequate evidence that leave policies were not uniformly applied, thus meeting her burden under McDonnell Douglas. Rhoads, 257 F.3d at 393–94. Alternatively, the court found that the plaintiff had produced both direct and indirect evidence of retaliatory animus (alleged threats and temporal proximity between employer's receipt of letters from plaintiff's

lawyer and plaintiff's termination) sufficient to create a genuine issue of fact under the evidentiary approach. See id.

In addition, the plaintiff must illustrate close temporal proximity between the "employer's knowledge of protected activity" and the alleged retaliatory action. Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001); see also Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999) (stating that one and a half months is sufficiently short to demonstrate causation, but three months is too long). However, temporal proximity alone will not suffice where the passage of time undermines any conclusion that the events are causally connected. See Breeden, 532 U.S. at 273-74 (finding that a twenty-month gap suggested "no causality at all"; citing cases finding no causal link when the gap was only three or four months). In that event, the plaintiff may also establish causation by presenting circumstantial evidence of retaliatory intent during the longer intervening period between the protected conduct and the adverse action. See, e.g., Lettieri v. Equant Inc., 478 F.3d 640, 650-51 (4th Cir. 2007) (intervening events between protected conduct and termination showed continuing retaliatory animus).

### 2. <u>Protected Conduct</u>

Here, Plaintiff filed an EEOC discrimination charge on April 2, 2015, and subsequently filed an EEOC retaliation charge in February 2016. (Fourth Am. Compl. (Doc. 42) ¶¶ 47, 53.) These acts were each protected conduct. <u>See, e.g.</u>, <u>Sumner v. U.S. Postal Serv.</u>, 899 F.2d 203, 209 (2d Cir. 1990). Plaintiff alleges other acts that potentially also constitute protected conduct: (1) in early October 2015, Plaintiff sent a department-wide email regarding poor treatment of detention officers that he may have believed was motivated by racial considerations, (Fourth Am. Compl. (Doc. 42) ¶ 51); and (2) in May 2016, Plaintiff complained informally about differential treatment of white and black officers. (<u>Id.</u> ¶ 58.) This court finds that each of these acts constitute protected conduct because they are reasonably viewed as opposing discriminatory treatment that potentially violated Title VII.

This court is not, however, swayed by Plaintiff's assertion that his request for donated sick leave was protected conduct. (<u>See</u> Pl.'s Resp. Br. (Doc. 55) at 19–20.) While this court agrees that a reasonable request for accommodation is protected, this court finds that an action violating the plain language of the employer's reasonable personnel regulations, (<u>see</u> Doc. 50-11 at 3), cannot constitute protected conduct under the ADA. <u>Cf.</u>

-28-

Thaddeus-X v. Blatter, 175 F.3d 378, 395 (6th Cir. 1999)

(holding, in the First Amendment retaliation context, that, "if

a prisoner violates a legitimate prison regulation, he is not

engaged in protected conduct"). Had Plaintiff followed

department procedures and submitted his request for donated

leave directly without independently approaching potential

donors, this submission would likely constitute protected

conduct. But Plaintiff, who possessed actual knowledge of the

Sheriff's Office personnel regulations, (see Pl.'s Dep. B (Doc.

58-2) at 43), cannot show "a good faith belief that the

requested accommodation was appropriate" when he knew it was

explicitly prohibited by department policy. Heisler v. Metro.

Council, 339 F.3d 622, 632 (8th Cir. 2003); see also

Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 191 (3d

Cir. 2003) ("Congress clearly did not intend to extend the reach

of the ADA's umbrella to employees whose motivation for

requesting an accommodation is something other than a good faith

belief that an accommodation under the Act is necessary or

appropriate."). Further, the legitimate basis for the Sheriff's

Office regulation is patently clear: to prevent employees,

particularly those in positions of authority, from applying

undue personal pressure on more junior colleagues, and to

prevent junior employees from feeling pressure to accommodate a

more senior friend or colleague. Plaintiff's violation of the department policy, of which he was aware, is prohibited, not protected, conduct.

### 3. Adverse Action

Plaintiff alleges a number of adverse actions as part of his retaliation claim: (1) in May 2015, a Sheriff's Office secretary improperly edited Plaintiff's time card to reduce his pay, which she stated was in response to an email from HR, (Fourth Am. Compl. (Doc. 42) ¶ 48); (2) in June 2016, an administrative lieutenant improperly removed holiday pay amounts from Plaintiff's paycheck, (id. ¶ 62); (3) beginning in June 2015, Plaintiff's work files and email account were tampered with and his emails were monitored, (id. ¶ 49); (4) in June 2015, Plaintiff received a letter of counsel reprimand for failing to perform cell checks correctly, when this was Plaintiff's first infraction and employees would normally receive only a verbal warning, (id. ¶ 50); (5) in October 2015, Plaintiff was admonished by Defendant during a meeting shortly after Plaintiff's then-attorney had sent a demand letter, (id. ¶ 52); (6) in April 2016, Plaintiff was banned from wearing his toboggan inside the office despite adhering to the uniform code, (id. ¶¶ 54–56); (7) in May 2016, one day after complaining about differential treatment, Plaintiff's parking fob and key card

were deactivated for several days, (id. ¶¶ 59–61); (8) in September 2016, after Plaintiff submitted a list of co-workers willing to donate leave time, the potential donors were harassed and investigated by Internal Affairs, (id. ¶ 66); and (9) Plaintiff was terminated on November 4, 2016, after Defendant denied his request for additional unpaid leave. (Id. ¶¶ 67–70.)

This court determines that Plaintiff has not proffered evidence from which a reasonable juror could find that certain of these alleged events were in fact adverse actions, conduct that would have dissuaded a reasonable employee from opposing discriminatory treatment. Initially, this court does not believe that actions causing short-term frustration or anger can amount to materially adverse actions when these issues are quickly rectified. To this court, such events amount to no more than "petty slights or minor annoyances that often take place at work and that all employees experience." Burlington N. & Santa Fe, 548 U.S. at 68.

For example, the toboggan ban was lifted after Plaintiff produced a doctor's note, (Fourth Am. Compl. (Doc. 42) ¶ 57), and Plaintiff's parking fob and key card were re-activated within a week, (id. ¶ 61). The removal of holiday pay from Plaintiff's June 2016 paycheck did not have any ultimate negative impact on Plaintiff because the error was corrected,

(id. ¶ 62; Pl.'s Dep. B (Doc. 58-2) at 31–33), and Plaintiff presents no evidence that this issue was anything more than an administrative error, nor that anyone acted intentionally to remove the pay. With regard to Plaintiff's first time-card-tampering claim in May 2015, Defendant asserts that this error was also corrected with no detrimental effect on Plaintiff. (Def.'s Mem. (Doc. 54) at 6.) Plaintiff has not refuted this statement. Quite simply, these events are nothing more than everyday annoyances that most employees experience and they do not amount to adverse action. See Adams v. Anne Arundel Cty. Pub. Schs., 789 F.3d 422, 431 (4th Cir. 2015) (an adverse action entails "some direct or indirect impact on an individual's employment as opposed to harms immaterially related to it"); see also Heno v. Sprint/United Mgmt. Co., 208 F.3d 847, 857 (10th Cir. 2000) ("Moving her desk, monitoring her calls, being 'chilly' towards her, and suggesting that she might do better in a different department simply did not affect Ms. Heno's employment status.").

Plaintiff further alleges that Defendant (1) monitored and tampered with his work email account, (Fourth Am. Compl. (Doc. 42) ¶ 49), and (2) reprimanded Plaintiff at an October 2015 meeting, (id. ¶ 52). Regarding Plaintiff's email issues, courts have consistently held that "close scrutiny, monitoring, or

tracking of an employee's whereabouts — without more — simply
does not rise to the level of a materially adverse retaliatory
action." See Aldrich v. Burwell, 197 F. Supp. 3d 124, 132–33
(D.D.C. 2016) (collecting cases); see also Shannon v. Va. Dep't
of Juvenile Justice, Civil Action No. 3:06CV413, 2007 WL
1071973, at *4 (E.D. Va. Apr. 4, 2007), aff'd, 258 F. App'x 583
(4th Cir. 2007) ("The bulk of the alleged retaliatory actions
(i.e., removal from employee directory, opened mail, removal of
nameplate, closed email account, monitoring, and unfriendly
treatment by co-workers) fall into the petty slights and minor
annoyances category."). Here, Plaintiff's allegations do not
suggest any concrete harm to Plaintiff's employment status (such
as a decrease in compensation or opportunity for promotion) that
resulted from any email monitoring or tampering. Nor has
Plaintiff established that this email account was anything other
than an employer-provided address that was properly monitored in
the same manner as all other employee accounts. (See Pl.'s Dep.
A (Doc. 53-1) at 45–46.)

    As to the October 2015 meeting, Plaintiff testified that
Defendant made a general statement to Plaintiff suggesting that
Defendant would acknowledge any wrongful actions on his part but
otherwise would fight a protracted legal battle. (Pl.'s Dep. B
(Doc. 58-2) at 51–52.) This court finds Plaintiff's description

of the meeting more akin to a personality conflict between two individuals than an adverse employment action. See Burlington N. & Santa Fe, 548 U.S. at 68 ("[P]ersonality conflicts at work that generate antipathy . . . are not actionable.") (quoting 1 B. Lindemann & P. Grossman, Employment Discrimination Law 669 (3d ed. 1996)); see also Heno, 208 F.3d at 857 (finding that a supervisor's "chilly" behavior was not adverse action). Plaintiff understood Defendant to be referring to Plaintiff's lawsuit, which had commenced by this time according to Plaintiff. (Pl.'s Dep. B. (Doc. 58-2) at 51.) In fact, although Plaintiff had already filed an EEOC charge at that time, the instant lawsuit was not filed until December 29, 2015, more than two months after the October meeting. Plaintiff offers no evidence, other than his own incorrect assertion that he "had a lawsuit" in October 2015, (see id.), to support a finding that Defendant was referring specifically to Plaintiff or Plaintiff's lawsuit.

In addition, Plaintiff made no mention in either his original complaint or his first amended complaint of Defendant's actions at the October meeting. In his second amended complaint, Plaintiff states for the first time that Defendant pointed at him and made certain comments following a demand letter from Plaintiff's attorney. (See Doc. 26 ¶ 51; see also Doc. 33 ¶ 51.)

-34-

Setting aside these inconsistencies and drawing any inferences in favor of Plaintiff, Plaintiff has offered no evidence at this stage of a demand letter, what that letter may have stated or requested, or that Defendant in fact received a demand letter immediately prior to the October meeting. Even assuming that Plaintiff's version of the facts is true — that Defendant pointed at Plaintiff, told Plaintiff he would fight any lawsuit if he was in the right, and said he had instructed his attorneys to go to trial — Plaintiff fails to provide any contextual facts to permit a finding that Defendant was speaking about Plaintiff or, more particularly, speaking in retaliation for any discrimination complaint.

Although Plaintiff has presented no evidence that would permit a jury to find that Defendant's statements were directed toward Plaintiff's lawsuit, even assuming Defendant's statements at the October meeting could be interpreted as discouraging Plaintiff from continuing to pursue the complaints in his EEOC charge, the claim fails. Viewing the evidence in the light most favorable to Plaintiff, only two documents reflect allegations made by Plaintiff prior to the October 2015 meeting about which Defendant could have been aware: the initial EEOC charge and the EEOC right-to-sue letter. (See Docs. 10-1, 10-2.) Notably, the EEOC charge alleges a litany of improper activity by the

-35-

Sheriff's Department generally but, as to Plaintiff specifically, alleges only that he did not apply for a transfer to a patrol position out of concern that he would be demoted. (See Doc. 10-1.) Taken in context, then, Defendant's statements in October 2015 can, at most, be construed as describing Defendant's belief about the allegations in Plaintiff's initial EEOC charge. For example, Plaintiff alleges in the EEOC charge that "[i]n recent years I have witnessed and been subjected to a pattern and practice of discriminatory treatment toward Black/African American employees in comparison to the preferential treatment and favoritism shown toward White/Caucasian employees." (Id.) Defendant's statements are nothing more than a firm response to broad allegations of racial discrimination, rather than a specific retaliatory threat to Plaintiff for making the allegations.

For example, in Dunn v. Washington Cty. Hosp., the Seventh Circuit confronted a retaliation claim involving much stronger language. 429 F.3d 689, 692–93 (7th Cir. 2005). In that case, Plaintiff alleged that she was urged to drop her sex discrimination complaint and told that "paybacks are hell." Id. at 692 (alterations omitted). The Seventh Circuit observed that "[t]alk is cheap; unless [plaintiff] knew that [defendant] had sabotaged the career of other nurses, [defendant's] statements

would not have dissuaded reasonable persons from protecting their own rights under the statute and thus cannot violate Title VII." Id. On similar facts, the Seventh Circuit concluded that "the pressure to drop [a] suit could not have amounted to a materially adverse action because the statements" did not cause demonstrable harm. Burton v. Bd. of Regents of Univ. of Wis. Sys., 851 F.3d 690, 697 (7th Cir. 2017).

This court finds that the statements here can only be reasonably viewed as describing Defendant's belief about discrimination in the department generally, and possibly the outcome of any subsequent litigation, rather than suggesting that Plaintiff should refrain from pursuing any legal claims or that Defendant would retaliate against Plaintiff at work for discrimination complaints.[7] Therefore, this court finds that Defendant's remarks at the October 2015 meeting did not constitute adverse action.

Two of the alleged adverse actions relate to what Plaintiff characterizes as disproportionate responses by Defendant to

---

[7] The material adverse action standard is objective. Burlington N. & Santa Fe, 548 U.S. at 68. While Defendant's statement about instructing his attorneys to fight when he believes he has done no wrong might dissuade an employee from bringing a frivolous legal claim, an employee with a legitimate claim presumably should not be dissuaded from pursuing that claim simply because the opposing party professes a belief that the litigation will vindicate their side of the dispute.

disciplinary violations. This court notes first that, while enforcement of internal policies alone is not adverse action, enforcement of disciplinary measures may on extreme occasions rise to an adverse action when measures are either disparately applied across an organization or are "so extreme and intrusive as to constitute harassment." Aldrich, 197 F. Supp. 3d at 134. In Aldrich, which this court finds persuasive, the court suggested that discriminatory enforcement itself (absent termination or other materially adverse consequences) would rarely constitute adverse action because enforcement of workplace standards, even in a discriminatory manner, is not sufficiently harmful to the employee. See id.; cf. Rhoads, 257 F.3d at 394 (reversing grant of summary judgment for the defendant where the plaintiff "was terminated, purportedly for excessive unexcused absenteeism, even though her fellow employees had not been discharged for the same conduct"; not opining on whether the enforcement of reasonable disciplinary measures alone would have constituted adverse action).

Here, Plaintiff alleges first that he was given a "letter of counsel" for improperly inspecting cells in June 2015, (Fourth Am. Compl. (Doc. 42) ¶ 50), when a verbal warning is normally issued for an employee's first offense. Plaintiff admits that he failed to properly inspect cells. (Pl.'s Dep. A

(Doc. 53-1) at 30-31.) Additionally, Plaintiff admits that a white sergeant was also issued a counsel letter for the same exact infraction. (Id.) Without reaching the issue of whether selective or disparate enforcement alone, at a sufficiently severe level, can constitute adverse action, this court finds that Plaintiff has not proffered evidence to rebut Defendant's showing that the letter of counsel was in fact normal under Sheriff's Office policy and non-discriminatory. Second, Plaintiff alleges that an internal affairs investigation was conducted into Plaintiff's leave donation requests, even though this was a common practice in the department. (Fourth Am. Compl. (Doc. 42) ¶ 66.) However, it is uncontested that Plaintiff was ultimately permitted to use all of the donated leave. (Def.'s Mem. (Doc. 54) at 19; Pl.'s Dep. B (Doc. 58-2) at 42.) Therefore, Plaintiff suffered no harm and there was no adverse action. See Adams, 789 F.3d at 431.

### 4.  Causation

This court is left with Plaintiff's termination on November 4, 2016. It is well-established that termination is a materially adverse action. See Burlington N. & Santa Fe, 548 U.S. at 67; Strothers, 895 F.3d at 328. Under Nassar and Foster, Plaintiff must prove that retaliatory motives played a necessary part in his termination, such that he would not have been

-39-

terminated but for these impermissible considerations. <u>See</u>
<u>Guessous</u>, 828 F.3d at 216–17. Here, it may be true that
impermissible retaliatory motives played some minor role in
Plaintiff's termination. However, because it remains undisputed
that Plaintiff was medically unable to work, this court believes
no reasonable juror could find that any impermissible
considerations were a but-for cause of Plaintiff's termination.

Plaintiff concedes that he was unable to work at the time
he was terminated and had not received medical approval to
return to work at any definite point in the future. (<u>See</u> Pl.'s
Dep. A (Doc. 53-1) at 27–28.) Plaintiff also concedes that the
Sheriff's Office was understaffed. (<u>See</u> <u>id.</u> at 22; Doc. 53-3 at
6.) The need to hire additional detention staff to cover
Plaintiff's responsibilities, not any impermissible desire to
retaliate, is the only reasonable but-for cause of Defendant's
decision to terminate Plaintiff rather than grant additional
medical leave.

If proceeding under the burden-shifting framework,[8] Plaintiff has also failed to provide any evidence of pretext. Crucially, Plaintiff does not refute Defendant's reason for the termination. Plaintiff alleges that "[s]imilarly situated white officers without pending EEOC charges were allowed to extend disability-related leave multiple times over the course of months or years without facing termination." (Fourth Am. Compl. (Doc. 42) ¶ 71.) Yet Plaintiff's evidence, (see Doc. 58-14), shows only that certain white and black employees were permitted extended unpaid post-Family Medical Leave Act ("FMLA") leave. Because other black officers with pending EEOC charges were extended such leave, the evidence undermines any argument that the denial of Plaintiff's leave request was motivated primarily by retaliation due to his EEOC charge. For example, the two listed black officers who filed EEOC charges were provided post-FMLA leave of 227 days and 110 days, respectively. (See id.) Second, Plaintiff fails to show that any officers were

---

[8] Plaintiff may also prove retaliation by indirect evidence, but still must show that retaliatory animus was a but-for cause. However, the indirect evidence route is challenging because "it is the rare case in which an employer admits not just to possessing an impermissible motive, but also to acting upon it." Foster, 787 F.3d at 249 n.6. The McDonnell Douglas framework, which establishes an initial presumption in the employee's favor, is thus almost always the easier route.

similarly-situated to him in terms of medical clearance for returning to work.[9]

Further, Plaintiff's termination was closer in time to his anxiety diagnosis and initial request for medical leave than to any protected conduct. This is further evidence that Plaintiff's termination was, in fact, due to his inability to work. Plaintiff's deposition testimony illustrates "that no amount of accommodation of [his] alleged handicap [would have] render[ed] him able to perform the essential functions of the position in question." Guillot v. Garrett, 970 F.2d 1320, 1327 (4th Cir. 1992); see also Carter v. Tisch, 822 F.2d 465, 467 (4th Cir. 1987); (Pl.'s Dep. A (Doc. 53-1) at 27–28.) Therefore, Plaintiff was susceptible to termination for a legitimate, non-retaliatory reason.

At the summary judgment stage, the law requires Plaintiff to produce evidence on which a reasonable juror could find that impermissible motives predominated. Plaintiff has failed to

---

[9] This court is also not convinced that evidence of such disparate treatment would necessarily be sufficient to rebut Defendant's proffered non-discriminatory rationale for the termination, because applying the ADA in this manner might discourage employers from providing anything more than the minimum required amount of leave to employees. See Myers v. Hose, 50 F.3d 278, 284 (4th Cir. 1995) ("If an employer undertook extraordinary treatment in one case, the same level of accommodation would be legally required of it in all subsequent cases; in other words, a good deed would effectively ratchet up liability, and thus not go unpunished.").

-42-

carry this burden. Therefore, Defendant's motion for summary judgment on Plaintiff's retaliation claim will be granted.

## C. **Failure to Accommodate**

Plaintiff alleges that Defendant failed to accommodate his request for additional unpaid leave in violation of the ADA. See 42 U.S.C. § 12101 et seq. To establish an ADA failure to accommodate claim, Plaintiff must show:

> (1) that he was an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position . . . ; and (4) that the [employer] refused to make such accommodations.

Rhoads, 257 F.3d at 387 n.11 (quoting Mitchell v. Washingtonville Cent. Sch. Dist., 190 F.3d 1, 6 (2d Cir. 1999)) (alterations in original). A leave of absence may, in certain circumstances, be a reasonable accommodation. See, e.g., Garcia-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 649–50 (1st Cir. 2000) (noting that short-term leave may be a reasonable accommodation when the requested leave is brief and the employer is able to obtain temporary assistance). However, "where it is unrealistic to expect to obtain someone to perform those essential functions temporarily until the sick employee returns, the employer may be entitled to discharge the ill employee and hire someone else." See id. at 650 (collecting cases holding

-43-

that it is unreasonable for an employee to "demand[] that her job be held open indefinitely"). An employer is not liable for violating the ADA when it "can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business." 42 U.S.C. § 12112(b)(5)(A); see also Reyazuddin v. Montgomery Cty., 789 F.3d 407, 416–17 (4th Cir. 2015).

Here, Plaintiff was first placed on medical leave on July 29, 2016. (Fourth Am. Compl. (Doc. 42) ¶ 64.) Plaintiff exhausted his paid FMLA leave on October 24, 2016. (Pl.'s Dep. A (Doc. 53-1) at 24.) Plaintiff then requested and was granted unpaid leave through November 4, 2016. (Id. at 24–25.) When Plaintiff subsequently requested further unpaid leave through December 20, 2016, this request was denied and Plaintiff was terminated. (Fourth Am. Compl. (Doc. 42) ¶¶ 67, 70; Doc. 53-3 at 6.) Plaintiff asserts that his termination exacerbated his medical issues, but does not contend that, at the time of termination, his doctor had provided any specific date when he

-44-

would have been able to return to work in any capacity.[10] (Pl.'s Dep. A (Doc. 53-1) at 27.)

Defendant informed Plaintiff in October 2016 that "[a]ny further extension [of Plaintiff's unpaid leave] would cause an undue hardship for the Sheriff's Office given the substantial personnel shortage in our Detention Division . . . ." (Doc. 53-3 at 6.) Plaintiff has offered no evidence to refute Defendant's assertion that the detention division was short-staffed. (See Pl.'s Dep. A (Doc. 53-1) at 22.) Plaintiff also knew that Defendant was unable to fill Plaintiff's position with temporary additional staffing; an existing sergeant, as opposed to any new temporary employee, handled Plaintiff's duties in his absence. (See id.) Plaintiff has further offered no evidence that he was, at any point after July 2016, able to perform the essential

---

[10] Plaintiff argues that a letter from his mental health therapist establishes that he would have been able to return to work if his request for additional leave had been granted, and that, therefore, "[t]he failure to accommodate and accompanying termination are the but-for cause of Hairston's current inability to work." (Pl.'s Resp. Br. (Doc. 55) at 23; see also Doc. 58-16.) This court disagrees. The letter does not indicate when, if ever, Plaintiff would have been able to perform the essential functions of his job if not terminated. Further, the letter states that Plaintiff's symptoms were present on August 3, 2016, well prior to Plaintiff's termination. (See Doc. 58-16.) Although the letter states in vague fashion that "with recent changes in his work status his symptoms have worsened," (id.), at no point does Plaintiff's mental health therapist opine that either the alleged failure to accommodate or the termination was a but-for cause of Plaintiff's inability to work.

functions of his job even with an accommodation. "The case law is clear that, if a handicapped employee cannot do his job, he can be fired, and the employer is not required to assign him to alternative employment." Carter, 822 F.2d at 467.

Plaintiff's argument that other officers and supervisors received the accommodation of extended leave up to more than three months, (Pl.'s Resp. Br. (Doc. 55) at 22), is not persuasive because Plaintiff offers no evidence regarding the circumstances of their employment or the circumstances under which leave was approved.[11] Most notably, Plaintiff identifies no instance where another employee sought extended leave beyond the date that a doctor had certified the employee would be able to return to work. It is not disputed that Plaintiff was granted leave up to his represented return-to-work date of November 4,

---

[11] Plaintiff has produced a chart that lists Sheriff's Office employees who received additional leave after exhausting their FMLA leave. (See Doc. 58-14.) Notably, the chart contains no information regarding the specific circumstances of each employee's leave request and possible return-to-work date, information which this court finds especially relevant to any comparison. The chart further illustrates that the accommodation provided to a detention officer who has used all available FMLA leave is dependent, at least in part, upon the detention division's staffing situation at that specific point in time. For example, after three officers were placed on extended post-FMLA leave in mid-2016, officers who requested leave later that year were generally provided with a shorter leave period. (See id.) This suggests that Defendant was attempting to provide reasonable accommodation up to the point where "the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A).

2016, (see Pl.'s Dep. A (Doc. 53-1) at 26), that Plaintiff
applied for additional leave but could not provide any new
approximate or anticipated return-to-work date, (see id. at 27-
28), and that Plaintiff's absence caused an undue hardship to
his employer because of the substantial shortage of detention
personnel from September to December of 2016, (see id. at 22).
Finally, this court notes that, although Plaintiff was
continuously under the care of a mental health therapist
beginning on August 3, 2016, Plaintiff's application for
extended leave from November 4, 2016 to December 20, 2016 did
not include a specific prognosis, return-to-work date, or even a
statement that a doctor had extended the November 4, 2016
return-to-work date. (See Doc. 53-3 at 6.)

This court finds that Plaintiff fails to create genuine
issues of fact as to (1) whether post-November 2016 unpaid leave
was a reasonable accommodation, and (2) whether Plaintiff could
perform the essential functions of his job in any way, including
with accommodation. Therefore, no reasonable juror could find
that Plaintiff has established a prima facie case of failure to
accommodate. Defendant's motion for summary judgment on this
claim will be granted.

-47-

### D.  __North Carolina Constitutional Claims__

Plaintiff brings state law discrimination and retaliation claims pursuant to Article I, Section 19 of the North Carolina State Constitution, which provides that: "[n]o person shall be denied the equal protection of the laws; nor shall any person be subjected to discrimination by the State because of race, color, religion, or national origin." N.C. Const. Art. I, § 19. The Eleventh Amendment bars lawsuits against a state in federal court without the state's consent, and this protection extends to "state agencies and other government entities properly characterized as arms of the State." Gray v. Laws, 51 F.3d 426, 430 (4th Cir. 1995) (internal quotation marks and alterations omitted) (quoting Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1977)). While Congress has expressly abrogated state immunity for Title VII claims, see, e.g., Savage v. Maryland, 896 F.3d 260, 275 (4th Cir. 2018), the Eleventh Amendment potentially bars any state law or state constitutional claims. However, the Fourth Circuit has also held that "the Eleventh Amendment does not bar a suit against a North Carolina sheriff in his official capacity" because sheriffs are properly viewed as local, not state, officials. Harter v. Vernon, 101 F.3d 334, 343 (4th Cir. 1996).

-48-

"[A] plaintiff whose rights under the North Carolina
Constitution have been violated may pursue an action directly
under the state constitution only if there is no other remedy
under state law to redress the violation." Love-Lane, 355 F.3d
at 789. Here, because Plaintiff has potential alternative
remedies under either the North Carolina Persons With
Disabilities Act for his ADA retaliation claim or under breach
of contract for his discrimination claim, Plaintiff cannot sue
directly under the state constitution and Defendant's motion for
summary judgment on this claim will be granted. See Googerdy v.
N.C. Agric. and Tech. State Univ., 386 F. Supp. 2d 618, 629–30
(M.D.N.C. 2005) (finding plaintiff's constitutional racial
discrimination claim potentially barred by a breach of contract
remedy); Sheaffer v. Cty. of Chatham, 337 F. Supp. 2d 709, 730–
31 (M.D.N.C. 2004) (finding that plaintiff had non-
constitutional state law remedies for disability discrimination
claims). Alternatively, this court finds that the analysis of
Plaintiff's discrimination and retaliation claims under the
North Carolina Constitution is identical to the Title VII and
ADA analyses set forth herein. See Forbes v. City of Durham, 805
S.E.2d 159, 168 (2017).

-49-

## VI. __MOTIONS TO SEAL__

There are two motions to seal currently pending in this case. Defendant has moved to seal all exhibits to his motion for summary judgment, unredacted copies of which have been filed at Docs. 53-1 to 53-9, because these documents contain references to and personnel information regarding members of the Guilford County Sheriff's Office not party to this case. (Doc. 52 at 3.) These exhibits include excerpts from Plaintiff's deposition testimony and documents from Plaintiff's personnel file. Plaintiff separately moves to seal "Exhibits 3, 8, 9, 10, 11, and 16 to Plaintiff's Response Brief in Opposition to Defendant's Motion for Summary Judgment," which contain Plaintiff's personal medical records. (Doc. 57 at 3.) Plaintiff also notes in his motion that "Defendant has asserted a confidentiality interest in personnel records and the identities of non-party personnel in . . . Exhibits 2, 4, 5, 7, 12, 13, 14, and 15" to Plaintiff's response brief, suggests that Defendant will file a brief relating to these documents specifically, and moves to seal these documents. (__Id.__) Defendant, however, has not submitted any filing regarding the exhibits to Plaintiff's response brief. Neither motion to seal is opposed by the other party.

-50-

A.   **Briefing Issues**

Defendant's motion to seal, (Doc. 51), clearly relates only to Defendant's exhibits because Plaintiff had not yet responded to the motion for summary judgment at that time. This court is troubled by the fact that Defendant apparently intends to piggy-back on Plaintiff's motion to seal the exhibits to Plaintiff's response without any independent legal analysis or justification beyond that contained in Defendant's initial brief. The exhibits to Plaintiff' response opposing summary judgment contain, in certain places, additional material not attached to Defendant's motion for summary judgment. For example, the excerpt from Plaintiff's November 16, 2017 deposition testimony attached by Defendant omits pages that are included in the excerpt attached by Plaintiff. (Compare Doc. 53-1 with Doc. 58-2.) The fact that the additional pages included in Doc. 58-2 appear to contain testimony regarding potentially sensitive matters relating to Sheriff's Office employees who are not parties to this case, (see, e.g., Pl.'s Dep. B (Doc. 58-2) at 15, 34, 44–45, 55–56), is especially concerning.

Neither party has submitted any document to this court describing why Exhibits 2, 4, 5, 7, 12, 13, 14, and 15 to Plaintiff's response opposing summary judgment should be sealed or redacted. As discussed above, these documents are different

-51-

in certain important respects from those attached to Defendant's motion for summary judgment. The process of sealing a judicial record is not a rubber stamp and "must be necessitated by a compelling government interest." Rushford v. New Yorker Magazine, Inc., 846 F.2d 249, 253 (4th Cir. 1988) (citing Press-Enter. Co. v. Super. Ct. of Cal., 464 U.S. 501, 510 (1984)). Therefore, this court will not simply assume that the legal analysis for sealing or redacting both sets of exhibits is the same. This court would ordinarily deny Plaintiff's motion to seal the attachments to Plaintiff's response in which the Defendant asserts a confidentiality interest because this motion is unsupported. However, this court recognizes that doing so would make public the vast majority of information contained in Defendant's exhibits and thus effectively render Defendant's initial motion to seal moot.

Instead, this court will deny the portion of Plaintiff's motion that relates to documents containing Sheriff's Office personnel information about non-party employees, but stay its order for a period of ten days to permit Defendant to file an additional motion and brief to seal Exhibits 2, 4, 5, 7, 12, 13, 14, and 15 to Plaintiff's response opposing summary judgment. This brief shall set forth the specific information in each document that Defendant believes is confidential and should be

sealed or redacted, and the legal basis for each such request. This court notes that, as described further herein, it does not consider the naming of other Sheriff's Office employees to be a concern that would ordinarily warrant sealing an entire document as opposed to redacting individual names from the document and making the redacted version publicly available.

B.  **Legal Standard**

"[T]he courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents." Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 597 (1978). The First Amendment requires that "the denial of access [to judicial records] . . . be necessitated by a compelling government interest and narrowly tailored to serve that interest." Rushford, 846 F.2d at 253. This standard "appl[ies] to documents filed in connection with a summary judgment motion in a civil case." Id.

To determine whether a judicial record should be sealed, this court:

> must [] weigh the appropriate competing interests
> under the following procedure: it must give the public
> notice of the request to seal and a reasonable
> opportunity to challenge the request; it must consider
> less drastic alternatives to sealing; and if it
> decides to seal it must state the reasons (and
> specific supporting findings) for its decision and the
> reasons for rejecting alternatives to sealing.

Va. Dep't of State Police v. Wash. Post, 386 F.3d 567, 576 (4th
Cir. 2004).

## C. **Analysis**

Here, the public has had sufficient notice and opportunity
to object to both motions to seal, which were filed on April 16,
2018 and May 7, 2018, respectively.

Regarding Defendant's motion to seal, (Doc. 51), there is a
compelling interest in maintaining confidentiality of sensitive
personnel information. See, e.g., Donald v. Rast, 927 F.2d 379,
381 (8th Cir. 1991). However, this court finds that any
embarrassment caused by the sensitive nature of this information
can be eliminated by redacting only certain portions of the
relevant documents that contain the names of non-party Sheriff's
Office employees and any potentially objectionable statements or
allegations about these employees. See, e.g., Robinson v.
Bowser, No. 1:12CV301, 2013 WL 3791770, at *3–4 (M.D.N.C.
July 19, 2013) (approving redaction of certain portions of a
summary judgment memorandum that "concern[ed] sensitive
personnel information regarding a non-party"). This court is
obligated to weigh the "common law right to inspect and copy
judicial records and documents." In re Knight Pub. Co., 743 F.2d
231, 235 (4th Cir. 1984). After taking this consideration into

account, this court finds that redaction strikes the appropriate balance here.

This court will next consider Plaintiff's motion to seal. (Doc. 56.) This court finds that there is a compelling government interest in favor of sealing confidential, sensitive medical records that have no direct bearing on the summary judgment outcome. See, e.g., Rock v. McHugh, 819 F. Supp. 2d 456, 475–76 (D. Md. 2011) ("[S]ensitive medical or personal identification information may be sealed," but only to the extent that it does not form the basis for a plaintiff's claims.). Here, Plaintiff's medical records are not as integrally related to his claim as in most ADA cases. Defendant does not dispute that Plaintiff has a disability, but merely disputes whether this disability would have improved with further unpaid leave such that Plaintiff could resume working. Therefore, the exact details of Plaintiff's medical condition, as opposed to statements regarding Plaintiff's potential ability to return to work, are irrelevant to Plaintiff's legal claim. This court finds that redaction, a less drastic alternative, is also appropriate here. The portions of the relevant exhibits that relate to Plaintiff's potential ability to return to work should be left unredacted because these details bear directly on Plaintiff's claims in this lawsuit. As to those portions

describing only Plaintiff's symptoms and medications, this court finds that the compelling interest to protect patient confidentiality trumps the public right of access.

Defendant's motion to seal, (Doc. 51), and Plaintiff's motion to seal, (Doc. 56), will each be construed as a motion to seal or redact. Defendant's motion to seal will be granted, but Defendant will be directed to file proposed redacted copies of each document attached to its motion for summary judgment — redacting the names and sensitive passages relating to non-party Sheriff's Office employees but leaving unredacted all other portions — within ten days of the date of this order.

Plaintiff's motion to seal will be granted as to Docs. 58-3, 58-8, 58-9, 58-10, 58-11 and 58-16. Plaintiff will be directed to file proposed redacted copies of each of these documents — redacting the portions that describe Plaintiff's specific symptoms, treatment and medication but leaving unredacted the portions that relate to Plaintiff's potential ability to return to work — within ten days of the date of this order. Plaintiff's motion to seal will be denied as to the other documents listed in the motion: Docs. 58-2, 58-4, 58-5, 58-7, 58-12, 58-13, 58-14 and 58-15. As described above, this portion of the court's order will be stayed for a period of ten days and Defendant shall be permitted to file a supplemental motion and

-56-

brief addressing the documents attached to Plaintiff's response opposing summary judgment, which shall include proposed redacted versions of these documents.

## VII. <u>CONCLUSION</u>

For the foregoing reasons, this court finds that Defendant's motion for summary judgment should be granted as to each of Plaintiff's claims. This court further finds that Defendant's motion to seal should be granted and that Plaintiff's motion to seal should be granted in part and denied in part.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment, (Doc. 50), is **GRANTED.**

**IT IS FURTHER ORDERED** that the claims contained in the Fourth Amended Complaint, (Doc. 42), are **DISMISSED WITHOUT PREJUDICE.**

**IT IS FURTHER ORDERED** that Defendant's Motion to Seal, (Doc. 51), is **GRANTED** as described herein, and Defendant is directed to file proposed redacted copies of the documents identified in its motion within ten days.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Seal, (Doc. 56), is **GRANTED** as to Docs. 58-3, 58-8, 58-9, 58-10, 58-11 and 58-16, and Plaintiff is directed to file proposed redacted copies of these documents within ten days.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Seal, (Doc. 56), is **DENIED** as to Docs. 58-2, 58-4, 58-5, 58-7, 58-12, 58-13, 58-14 and 58-15, and that this portion of the court's order is **STAYED** for ten days to permit Defendant to file a supplemental motion and brief in support of redacting these documents.

**IT IS FURTHER ORDERED** that this Memorandum Opinion and Order is **FILED UNDER SEAL** and the parties shall file, within ten days of the filing of this Opinion, a joint report identifying the information in the Opinion, if any, they contend should be redacted, along with an explanation of the basis for their proposed redactions and a draft of this Opinion with those proposed redactions. Because information contained herein will likely be considered confidential information by the parties, this Opinion shall remain sealed until the parties have had an opportunity to submit their requested redactions.

As no further claims remain in this matter, a judgment for the Defendant shall be entered contemporaneously with this Memorandum Opinion and Order.

This the 15th day of March, 2019.

_William L. Osteen, Jr._
United States District Judge